**In re ARDEN AND HOWE ASSOCIATES, LTD., a California Limited Partnership, Debtor.**

**Bankruptcy No. 90–28068–C–11.**

United States Bankruptcy Court,
E.D. California.

March 31, 1993.

Mark A. Serlin, Flaherty & Serlin, Sacramento, CA, for Chapter 11 Trustee.

Patrick Costello, Pillsbury, Madison & Sutro, and William McGrane, Zankel & McGrane, San Francisco, CA, for Home Exp., Inc.

John J. Hurley, Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, NY, for Marine Midland Realty Credit Corp.

## MEMORANDUM DECISION ON CONFIRMATION OF PLAN OF REORGANIZATION

CHRISTOPHER M. KLEIN, Bankruptcy Judge:

The contours of a lessee's right to remain in possession of a leasehold after the lessor rejects the lease pursuant to 11 U.S.C. § 365 are in issue. Confirmation of this plan of reorganization turns on whether a restrictive use covenant that "runs with the land" under state law can, after the lease is rejected, be enforced against one who acquires the shopping center from the trustee pursuant to the plan.

The chapter 11 trustee of the debtor shopping center owner rejected the unexpired lease with the anchor tenant to shed a restrictive use covenant barring night clubs from the shopping center. He then entered into a lease with a night club. The anchor tenant elected to remain in possession of the leasehold and wants to enforce the restrictive use covenant.

Two narrow questions are presented regarding rejection of an unexpired lease in which the debtor is lessor. First, is a restrictive use covenant that "runs with the land" under applicable state law enforceable against the trustee in any manner other than the offset authorized by 11 U.S.C. § 365(h)(2)? It is not. Second, can a plan of reorganization provide that the sole remedy against the trustee's transferee under the plan for breach of a restrictive use covenant that runs with the land be the offset authorized by 11 U.S.C. § 365(h)(2)? It can.

### FACTS

Arden & Howe Associates is a California limited partnership that developed and owns the Howe 'Bout Arden shopping center in Sacramento, California, which has a value of $16 million. Marine Midland Realty Credit Corporation ("Marine Midland") financed the development and has a $22.3 million claim.

Home Express, Inc. ("Home Express") has a 56,000–square–foot store in the shopping center and is the so-called anchor tenant. The Home Express lease includes the following restrictive use covenant:

[T]he Shopping Center is and will remain primarily retail in character, and, further, no part of which shall be used for the sale or leasing of automotive vehicles, trailers, campers or boats, or as a theater, auditorium, meeting hall, school, or other place of public assembly, gymnasium or health club, dance hall, billiard or pool hall, massage parlor, video game arcade, bowling alley, skating rink, car wash, *night club* or adult book or adult video tape store.... [1]

Lease For Home Express, Inc. (May 14, 1987) (emphasis supplied).

Vacancies in the shopping center led to chapter 11, first with the debtor in possession, then with a trustee. When the chapter 11 trustee stepped in, he succeeded to nearly completed negotiations to lease space to AKG, Inc. ("AKG"), an affiliate of

---

1. Lease, Article 3.1 (emphasis supplied). Substantially identical language is in the Memorandum of Lease that was recorded.

Bill Graham Enterprises, for use as a comedy club to be known as the Punch Line, little suspecting that it would provoke a firestorm of litigation.

Home Express sued the trustee, the debtor, and AKG in this court to enjoin execution of the AKG lease as a violation of the restrictive use covenant in the Home Express lease on the basis that the Punch Line is a night club.[2] The primary harm asserted by Home Express, other than offended principle, was potentially inadequate parking. The trustee countered by rejecting the Home Express lease, the injunction action was dismissed, and the Punch Line opened.

Home Express elected to remain in possession, appealed the lease rejection to the district court,[3] lost, and has appealed to the Ninth Circuit. It also sued Marine Midland in district court (1) for a declaration that, notwithstanding the lease rejection, Marine Midland is bound by the original lease terms if it forecloses on the shopping center and (2) for an injunction enforcing the covenant.[4] Home Express concedes that it has been unable to establish evidence to support its claim of inadequate parking.

The trustee and Marine Midland filed a joint plan of reorganization according to which Marine Midland will acquire the reorganized debtor in exchange for its claim plus enough cash to pay other creditors and fund the expenses of the reorganization.

Home Express opposes confirmation, contending (1) that the plan impermissibly takes part of its leasehold, to wit, the restrictive use covenant that, under California law, runs with the land, and (2) that

Marine Midland, by succeeding to the trustee's rights, inappropriately finesses its own liability.

The focus is on section 9.2 of the proposed plan, which provides that following the transfer of the shopping center to Marine Midland: "[Home Express'] rights ... shall remain fully enforceable against Marine or its nominee but Marine or its nominee shall in all other respects succeed to the full interest of the Trustee and the Debtor and the rejected lease shall not otherwise be enforceable against Marine or its nominee except as set forth in Section 365(h)." Plan Of Reorganization at 12–13, filed August 10, 1992.

The question now before this court is whether to confirm that plan of reorganization.

### DISCUSSION

The analysis of the rights of the parties puts the focus on 11 U.S.C. § 365(h), which prescribes the lessee's alternatives and remedies following the debtor-lessor's rejection of an unexpired lease. That section continues the policy of section 70b of the former Bankruptcy Act.[5] Few reported decisions light the way.

1. *The Lessee's Post–Rejection Rights.*

■ If the trustee rejects an unexpired lease of real property under which the debtor is lessor, the lessee may either treat the lease as terminated (if otherwise so entitled) or may remain in possession of the leasehold under the lease for the balance of the term and for any enforceable renewal terms. 11 U.S.C. § 365(h)(1).[6]

■ A lessee's rights against the estate when the lessee is in possession are re-

---

**2.** *Home Express, Inc. v. Arden & Howe Associates, Ltd.,* Adversary No. 91–2299 (Bankr. E.D.Cal.).

**3.** *Home Express, Inc. v. Arden & Howe Associates, Ltd.,* Appeal No. S–92–CV–00693 (E.D.Cal.).

**4.** *Home Express, Inc. v. Marine Midland Realty Credit Corporation,* No. Civ–S–92–815 (E.D.Cal.).

**5.** Section 70b provided in pertinent part:
   Unless a lease of real property expressly provides, a rejection of the lease or of any covenant therein by the trustee of the lessor does not deprive the lessee of his estate.
   Bankruptcy Act of 1898 § 70b.

**6.** The actual text of section 365(h)(1) is:
   If the trustee rejects an unexpired lease of real property of the debtor under which the debtor is the lessor, or a timeshare interest under a timeshare plan under which the debtor is the timeshare interest seller, the lessee or timeshare interest purchaser under such lease or timeshare plan may treat such lease or timeshare plan as terminated by such rejection, where the disaffirmance by the trustee amounts to such a breach as would entitle the lessee or timeshare interest purchaser to treat such lease or timeshare plan as terminated by virtue of its own terms, applicable nonbankruptcy law, or other agreements the lessee or

stricted to an offset against the rent reserved under the lease for damages occurring after rejection caused by the nonperformance of any obligation of the debtor under the lease. A lessee has no other rights against the estate for damages resulting from rejection. 11 U.S.C. § 365(h)(2).[7]

Section 365(h)(2) protects the lessee from rent increases or other exactions by the landlord except as provided in the lease. But it does not require the landlord to perform its obligations under the lease. *Upland/Euclid, Ltd. v. Grace Restaurant Co. (In re Upton/Euclid, Ltd.),* 56 B.R. 250 (9th Cir. BAP 1985); *In re Stable Mews Assoc.,* 35 B.R. 603 (Bankr.S.D.N.Y.1983).

The section is silent, however, regarding the lessee's rights against any entity or person other than the estate. No reported case determines the lessee's rights against entities to which the estate transfers its interest. Related issues are similarly murky.[8] The discussion of section 365(h)(2) in the *Collier* treatise ends with the accurate observation that "[a]ll this is more easily said than applied to specific situations and complex questions may arise...." 2 L. King, *Collier on Bankruptcy* ¶ 365.09 at 365–61 (1992).

### 2. *Nature of an Unexpired Lease in Bankruptcy.*

██ The treatment of a lease under the Bankruptcy Code is premised upon recognition that state law generally governs issues of property and leases of property.

A lease of real property is simultaneously a conveyance and a contract. It is a conveyance of an estate in the real property by which the landlord transfers the right to possession for a term, usually in exchange for rent, and in which the relationship between landlord and tenant is premised on privity of estate. And it is a contract between lessor and lessee containing obligations that are set forth in the covenants in the lease contract. Restatement (Second) of Property (Landlord and Tenant) § 1.2; 6 H. Miller & M. Starr, *California Real Estate* § 18.17 (2d ed. 1989). Lease covenants are generally interpreted according to contract principles.

██ While the Bankruptcy Code does not permit a taking of the lessee's estate in real property, it does authorize the landlord to reject executory lease covenants. 11 U.S.C. § 365(h); 2 L. King, *Collier on Bankruptcy* ¶ 365.09 at 365–60 (1992). The effect of rejection is to create a breach. 11 U.S.C. § 365(g). It is overbroad, however, to say that the rejected lease disappears. 1 D. Epstein, S. Nickles & J. White, *Bankruptcy* § 5–7e (1992).

### 3. *State Law.*

██ This lease is governed by California law. Under California law, a restrictive use covenant burdening contiguous land

---

timeshare interest purchaser has made with other parties; or, in the alternative, the lessee or timeshare interest purchaser may remain in possession of the leasehold or timeshare interest under any lease or timeshare plan the term of which has commenced for the balance of such term and for any renewal or extension of such term that is enforceable by such lessee or timeshare interest purchaser under applicable nonbankruptcy law.
11 U.S.C. § 365(h)(1).

**7.** The actual text of section 365(h)(2) is:

If such lessee or timeshare interest purchaser remains in possession as provided in paragraph (1) of this subsection, such lessee or timeshare interest purchaser may offset against the rent reserved under such lease or moneys due for such timeshare interest for the balance of the term after the date of the rejection of such lease or timeshare interest, and any such renewal or extension thereof, any damages occurring after such date caused by the nonperformance of any obligation of the debtor under such lease or timeshare plan after such date, but such lessee or timeshare interest purchaser does not have any rights against the estate on account of any damages arising after such date from such rejection, other than such offset.
11 U.S.C. § 365(h)(2).

**8.** Commentators suggest that enforcement against the debtor (as opposed to the estate) of a covenant not to compete found in a rejected executory contract is a discharge issue turning on whether a "claim" results rather than an executory contract issue. 1 D. Epstein, S. Nickles & J. White, *Bankruptcy* § 5–7g (1992).

"runs with the land" and binds the landlord's successors if three requirements are met. The contiguous real property must be particularly described in the lease; the lease must provide that successors are bound for the benefit of the demised real property; and the lease must be recorded. Cal.Civ.Code § 1470. Home Express touched all three bases.

■ The remedies for breach of the covenant are injunction or damages, normally at the election of the lessee-covenantee. 6 H. Miller & M. Starr, *California Real Estate* § 18.44 (2d ed. 1989).

4. *Effect of Lease Rejection on Restrictive Use Covenant.*

■ Since the restrictive use covenant runs with the land under California law, Home Express argues the restrictive use covenant is part of the leasehold estate that Home Express is authorized to retain under section 365(h)(1). And it argues that, even if offset against the rent reserved under the lease is the sole remedy against the estate under section 365(h)(2), the covenant nonetheless binds the trustee's successors and becomes enforceable by injunction once the trustee's interest ends. Both arguments fail.

a. Exclusivity of Offset as Remedy against the Estate.

Section 365(h) makes no mention of, and imparts no significance to, the concept of running with the land in connection with what constitutes the leasehold. The lessee is entitled to remain "in possession of the leasehold" estate. The key is possession. What the lessee is entitled to retain consists of the essential elements of a lease— possession, term, and rent.

Breaches of restrictive use covenants do not ordinarily work a dispossession. They are not part of the "leasehold" merely because they are part of the "lease." A contrary conclusion would open the door to permitting a state to "opt out" of section 365 in connection with leases by enacting legislation that all lease provisions run with the land. There would then be no room for the exclusive offset remedy imposed by section 365(h)(2).

b. Exclusivity of Offset as Remedy against Estate's Successors.

The argument that successors who take from the trustee are nonetheless bound by a covenant that runs with the land is more appealing but, in the end, unavailing. Its attraction lies in the settled proposition that state law defines property rights in bankruptcy. Its flaw can be demonstrated by an example. Assume that successors are bound by the rejected covenant even though the estate is not. The simple planning device would be to keep the chapter 11 trustee in place for the remaining lease term. There would then be no successor, and the right to enforce other than by offset would never be triggered.

The better answer is that once the bankrupt lessor rejects the unexpired lease, the executory covenants become enforceable against the estate and the estate's successors only by way of the offset authorized by section 365(h)(2). To treat the rejected executory covenants as merely temporarily unenforceable, i.e. only unenforceable against the estate, would transform section 365(h)(2) into a modified automatic stay provision. This is inconsistent with the statutory provision that allows an unexpired lease to be rejected "subject to section 365" as part of the plan of reorganization. 11 U.S.C. § 1123(b)(2); *cf. Solon Automated Serv. v. Georgetown of Kettering, Ltd.,* 22 B.R. 312, 315–16 (Bankr.S.D.Ohio 1982). And it is inconsistent with the reorganization goal of permanently restructuring liabilities so as to foster a viable economic entity.

c. Preemption of State Remedies.

■ The problem is how to harmonize section 365(h)(2) and the nonbankruptcy law that makes the restrictive use covenant run with the land. The answer lies in the difference between right and remedy.

California law validly establishes the property right that makes the restrictive use covenant binding on successors. And

it establishes remedies of damages and injunction.

The Congress specified that the sole remedy against the estate is offset against the rent reserved under the lease. It is done in language of preemption. In other words, section 365(h)(2) preempts all state remedies (an injunction in this instance) for breach of a restrictive use covenant by the trustee and by the trustee's successors.

As noted, the better view is that the preemption lasts for the duration of the lease term rather than merely for the duration of the bankruptcy estate's ownership of the property. Since the question is not entirely free from doubt, the provision in the plan that deals with the issue explicitly serves the useful function of removing doubt.

### d. Impact on Private Land Use Planning.

Home Express points out that its restrictive use covenant is a form of consensual private land use planning that ought not lightly be disturbed because it would upset rooted expectations upon which parties rely in making substantial investments. That is correct, but it makes no difference. Moreover, bankrupt shopping center tenants are not treated as well as bankrupt shopping center landlords.

The Bankruptcy Code's lease rejection provisions limit the utility of a shopping center lessee negotiating to impose a restrictive use covenant on a landlord. The earlier holdings in this case, as amplified here, are that such covenants fall when the lease is rejected under section 365, regardless of whether they run with the land.

The bankrupt shopping center landlord has a full range of alternatives. It can assume (or assign) the lease with all its restrictive use provisions. 11 U.S.C. §§ 365(b)(3) and (f).[9] It can reject, leaving the tenant to the choice of vacating or staying in possession, without the power to enforce restrictive use covenants except by way of offset. 11 U.S.C. § 365(h). Or it can use the threat of rejection as leverage to negotiate a change in the restrictive use covenants.

In contrast, the bankrupt tenant cannot shed restrictive use covenants except by vacating. If the debtor tenant wants to stay in possession of the property, it must assume the lease, including all restrictive use provisions. 11 U.S.C. § 365(b)(3). If the tenant rejects the lease, the landlord can force the tenant to vacate and lease the premises to someone else who is willing to comply with the restrictive use covenant.[10]

The Congress did not gut private land use planning when it enacted the provisions in section 365 that limit the effectiveness of restrictive use covenants in unexpired leases. The limitations operate in the circumscribed arena of unexpired leases and executory contracts. Other forms of private land use planning remain unaffected. Regardless of whether the statute reflects fair or sound policy, those potential tenants who have enough leverage to obtain a restrictive use covenant in a lease take on the risk that it may be rejected in bankruptcy.

### 5. The Plan of Reorganization.

Finally, there is the question of whether it is appropriate to permit Marine Midland to succeed to the trustee's immunity from

---

**9.** When it comes to assuming and assigning unexpired leases, "adequate assurance of future performance" has a specialized meaning in the case of shopping center leases regardless of whether it is the landlord or the tenant who is in bankruptcy:

(3) For the purposes of paragraph (1) of this subsection and paragraph (2)(B) of subsection (f), adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance—

. . . . .

(C) that assumption or assignment of such lease is subject to all the provisions thereof,

including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and

(D) that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

11 U.S.C. § 365(b)(3).

**10.** No provision in section 365 permits a lessee to retain a possessory interest in a rejected leasehold.

remedies other than offset against the rent. The answer is that it is appropriate, fair, and equitable.

The Supreme Court has recognized that bankruptcy courts have several sources of residual authority to mandate such protection for Marine Midland. *United States v. Energy Resources Co.,* 495 U.S. 545, 549, 110 S.Ct. 2139, 2142, 109 L.Ed.2d 580 (1990). A plan of reorganization may include any "appropriate provision not inconsistent with the applicable provisions" of the Bankruptcy Code. 11 U.S.C. § 1123(b)(5). Bankruptcy courts can "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a).

> These statutory directives are consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships. See *Pepper v. Litton,* 308 U.S. 295, 303–304 [60 S.Ct. 238, 243–244, 84 L.Ed. 281] (1939); *United States National Bank v. Chase National Bank,* 331 U.S. 28, 36 [67 S.Ct. 1041, 1045, 91 L.Ed. 1320] (1947); *Katchen v. Landy,* 382 U.S. 323, 327 [86 S.Ct. 467, 471, 15 L.Ed.2d 391] (1966).

*Energy Resources,* 495 U.S. at 549, 110 S.Ct. at 2142.

It is settled that a bankruptcy court can confirm a plan of reorganization that requires a creditor to apply payments in a particular manner that operates to reduce someone else's potential liabilities. *Id.* In order to do so, the court must conclude that such a provision is necessary to the success of the plan. Thus, in *Energy Resources* the bankruptcy court properly ordered the Internal Revenue Service to apply tax payments to trust fund liabilities, concomitantly reducing the personal liabilities of the debtor's responsible officers.

The first question, then, is whether restricting Home Express' remedy against Marine Midland to offset against the rent as provided by section 365(h)(2) is consistent with the Bankruptcy Code. One provision pertinent to the question is that a plan of reorganization may:

subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section.

11 U.S.C. § 1123(b)(2). If a lease can be rejected under a plan "subject to section 365," it is consistent with the Bankruptcy Code to expect that the rejected lessee who stays in possession under section 365(h)(1) may be limited to the offset against rent remedy of section 365(h)(2). *Cf. Solon Automated Services,* 22 B.R. at 316.

Moreover, the restriction placed on Home Express may add little because it may merely be declarative of the law under section 365(h)(2), the better view being that section 365(h)(2) applies for the duration of the lease and applies to successors. Thus, depending upon the true state of the law, section 9.2(b) of the plan is either necessary or redundant. In either event, the proposed restriction is consistent with sections 365 and 1123(b)(2) and clarifies an uncertain issue.

Next, there is the question whether expressly limiting Home Express to the section 365(h)(2) remedy is necessary to the success of the plan of reorganization. Under the plan, the shopping center emerges as a going concern in Marine Midland's hands. The economic viability of the shopping center depends in material part upon the AKG lease remaining in effect and in having the flexibility to enter into other favorable leases. If the Home Express restrictive use covenant becomes enforceable by injunction, the success of the reorganization will be threatened. In contrast, the damages remedy permitted by section 365(h)(2) does not threaten the success of the reorganization; Home Express has heretofore been unable to demonstrate any actual damages.

The alternatives are inconsistent with successful reorganization. If, as Home Express requests, the shopping center were to be abandoned to Marine Midland (or foreclosed upon), reorganization would not be possible. If the case were then dismissed, real ambiguity would be created. It is, for example, an open question whether dis-

missal would restore the rejected Home Express lease to its status quo before bankruptcy. *See* 11 U.S.C. § 349(b).[11] The clarity imposed by the disputed provision in a plan of reorganization that will be successful is much to be preferred.

Howe 'Bout Arden was not economically viable before bankruptcy. Revenue was not adequate to service the debt. Vacant space needed to be leased. The AKG lease solved part of the revenue problem and would not have been consummated without lease rejection under section 365. Even with the ensuing improvement in finances, the value is about 75 percent of Marine Midland's claim. Under the plan, Marine Midland shoulders much of the pain and the risk. Creditors who would be wiped out by a Marine Midland foreclosure will be paid. The estate will emerge from chapter 11 with a level of debt that can be serviced by lease revenues after operating expenses are paid. Clarifying that Home Express can enforce its restrictive use covenant only by offset against rent is necessary to the success of the reorganization.

The plan will be confirmed.

---

**11.** The legislative history of section 349 notes that:

> The basic purpose of the subsection is to undo the bankruptcy case, as far as practicable, and to restore all property rights to the position in which they were found at the commencement of the case. This does not necessarily encompass undoing sales of property from the estate to a good faith purchaser.

H.Rep. No. 95–595, 95th Cong., 1st Sess. 338 (1977); S.Rep. No. 95–598, 95th Cong., 2d Sess. 49 (1978). There is remarkably little precedent clarifying the tantalizing ambiguities posed by section 349.